IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 3, 2015

## STATE OF TENNESSEE v. DANNY STEVE WILKERSON

**Appeal from the Circuit Court for Hardin County**
**No. 9687     C. Creed McGinley, Judge**

_____

**No. W2014-00324-CCA-R3-CD  -  Filed May 5, 2015**

_____

Appellant, Danny Steve Wilkerson, was convicted by a jury of three drug-related offenses and received an effective sentence of ten years as a Range I, standard offender in the Tennessee Department of Correction. He appeals, challenging the sufficiency of the evidence supporting his convictions and the nature and length of his sentences. After a careful review of the record and the applicable law, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Chadwick G. Hunt, Savannah, Tennessee, for the appellant, Danny Steve Wilkerson.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Hansel L. McCadams, District Attorney General; R. Adam Jowers, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Factual and Procedural Background*

This is a direct appeal by Appellant of his jury convictions and sentences from the Circuit Court for Hardin County. On February 23, 2012, an affidavit of complaint was sworn out against Appellant in the General Sessions Court of Hardin County for

promotion of methamphetamine manufacture, initiation of methamphetamine manufacture, unlawful possession of drug paraphernalia, and possession of a firearm during the commission of a dangerous felony. An arrest warrant was issued for Appellant on the same day. Appellant waived his right to a preliminary hearing, and his case was bound over to the Hardin County Grand Jury. The grand jury indicted Appellant on all four counts,[1] and he was arraigned on November 27, 2012. Appellant was tried on July 30, 2013.

At trial, Investigator Keith Amos testified that he worked for Hardin County Sheriff's Department and had done so for twelve years. He was certified in detection and identification of methamphetamine and had prior experience with investigations involving methamphetamine.

On February 22, 2012, Investigator Amos, accompanied by Agent James Frazier of the McNairy County Sheriff's Department, went to Appellant's residence on Cherry Chapel Loop in Savannah, Tennessee. Both officers were investigating different individuals for the purchase of pseudoephedrine. Upon arrival, the officers approached the front of the trailer. The door was open so Investigator Amos knocked on the side of the trailer. Appellant's wife, Tina Wilkerson, went to the doorway, and Investigator Amos asked to speak with Appellant. Mrs. Wilkerson retrieved Appellant from outside behind the trailer, and he came to the doorway. Appellant was wearing a pair of latex gloves.

Investigator Amos asked Appellant about his purchase of pseudoephedrine the day before in Florence, Alabama. Appellant produced a thirty-count box of Claritin D and a prescription receipt from a prescription bag. The National Precursor Log Exchange ("NPLEx") is a nationwide database that contains records of pseudoephedrine purchases across the country. Investigator Amos knew from the NPLEx that Appellant had only purchased a fifteen-count box the previous day.

Investigator Amos asked Appellant for consent to search the residence, and Appellant verbally consented. Investigator Amos and Appellant waited inside the residence while Agent Frazier went behind the residence and investigated. Investigator Amos then began searching the inside of the trailer. Appellant showed his bedroom to Investigator Amos, where Investigator Amos discovered a set of digital scales in one of the drawers. Investigator Amos also discovered an unloaded .22 caliber "long gun"

---

[1] The affidavit of complaint charges Appellant with possession of a firearm during the commission of a dangerous felony in violation of Tennessee Code Annotated section 39-17-1324. However, Appellant was indicted for unlawful possession of a weapon in violation of Tennessee Code Annotated section 39-17-1307(d)(2).

inside the closet of the bedroom. Appellant stated that the gun was in the closet because it did not work. No ammunition was ever found for this gun.

After searching the bedroom, Investigator Amos joined Agent Frazier outside. Appellant followed. Agent Frazier indicated that he had discovered items used for manufacturing methamphetamine in a pickup truck about ten feet behind the trailer. Among other things, a black garbage bag was in the bed of the truck. Inside the bag, Agent Frazier found "some cooked-off bottles" and other items that had been used to manufacture methamphetamine. Among the other items were plastic bottles with contents inside that constituted an "active meth lab." A black and white plastic container in the bed of the truck also contained items for manufacturing methamphetamine. After discovering these materials, the officers arrested Appellant and called the Meth Task Force to clean up the location.

At the sheriff's office, Investigator Amos read Appellant his *Miranda* rights. Appellant signed a waiver of rights form and provided a signed, written statement on the form: "I take responsibility for what's found on my property."[2]

On cross-examination, Investigator Amos acknowledged that there were two separate "outbuildings" and another trailer located behind Appellant's trailer. Regarding the Wilkersons' relationship, he stated, "I know they live together. I mean, that's his wife. . . . They live in the same trailer; place of residence, the same mailing address, same last name." He did not recall either of them indicating that they did not live in the same trailer.

The pickup truck was registered to Appellant's daughter, Brandy Wilkerson. Investigator Amos expounded on the items discovered in the bed of the truck. There were ten "cooked-off bottles" in the garbage bag and a black bag that had a bottle that was "already active at making meth. It already [had] been cooked, just waiting to be gassed off." He explained that "cooked" meant "it had formed a copper beading around th[e] bottle, which is pseudoephedrine. And you have to take [a] gas generator to gas this pseudoephedrine to make a product." Investigator Amos explained that these liquid materials cannot be sent to an investigatory lab for forensic testing because the materials are unsafe. Accordingly, none of that material was tested for the presence of methamphetamine. However, Investigator Amos declared, "Under my experience of methamphetamine certification, identity of what methamphetamine labs are, and based on what we [saw], that was actual, active, live with pseudoephedrine being cooked on it."

_____

[2] This is the statement as testified to by Investigator Amos. However, the form, which was entered into evidence without objection, does not to contain the word "my."

Investigator Amos provided the following description of his conversation with Appellant at the sheriff's office: "He advised me that he didn't want his wife to go to jail. He didn't want his grandkids taken away. . . . He'd go to jail. He'd take responsib[ility] for what's there."

On redirect examination, Investigator Amos stated that there "may have been a coffee filter in [Appellant's] pocket" when he was searched. During re-cross examination, Investigator Amos stated that there "was a coffee filter there in his presence," but he could not recall for certain whether it came out of Appellant's pocket.

Agent James Frazier was a lieutenant for the McNairy County Sheriff's Department assigned to narcotics investigations. He had worked in the narcotics unit for the Hardin County Sheriff's Department for four and a half years before spending ten years with the McNairy County Sheriff's Department. Agent Frazier is certified "by the State of Tennessee to break down methamphetamine labs, package up methamphetamine labs and transport them, and know the working components of what's in a lab to recognize chemicals." He had experience investigating cases involving methamphetamine prior to Appellant's case.

On February 22, 2012, Agent Frazier met Investigator Amos at the Hardin County Sheriff's Department so that they could investigate various individuals in that county with regard to pseudoephedrine purchases. The first person that they went to investigate was Appellant. Agent Frazier confirmed that a woman met them at the door of the trailer and retrieved Appellant. Appellant verbally consented to a search of the premises. Agent Frazier then went "around the back of the trailer" while Investigator Amos was inside. Agent Frazier spotted a pickup truck, about ten or fifteen feet from the trailer, with an open garbage bag in the back. He observed what appeared to be a "HCL[3] hydrogen generator" and went to tell Investigator Amos.

The garbage bag contained some HCL gas generators, fashioned from twenty-ounce soda bottles, and "two one pots." Agent Frazier discussed a particular bottle that he found in the bed of the pickup truck:

> Inside here, the white stuff in the bottom is going to be your ammonia nitrate, and also your Red Devil lye. That's the two parts they use in there. And the liquid is either Coleman camp fuel or any kind of organic solvent[—]camp fuel, Ronson lighter fluid, ether, paint thinner. And the black stuff floating around in there is your lithium which you get from lithium batteries. You have to strip your batteries and get your lithium and put in there. And the copper beading on top of it is your solvated electrons

---

[3] The witness did not define this acronym.

which form[ ] when methamphetamine is produced in the bottle. . . .  The ephedrine pills are in there.

According to Agent Frazier, the contents within the bottle were "the first step in the manufacture."  He explained the process used to combine the ingredients in this step.

To complete the production process, the contents of the bottle would have to be poured through a coffee filter into a Mason jar, separating the liquid "meth oil" from the solid matter.  He explained that the soda-bottle gas generators could "use calcium chloride, which is DampRid, and muriatic acid" to function.  Several containers of DampRid were found in the bed of the pickup truck.  Agent Frazier then explained how the gas generators were used in the manufacturing process and described the final steps used to obtain a "finished product" of "crystals" of methamphetamine, which usually would be dried using a heat lamp.  He confirmed that they recovered materials from the back of the pickup truck "that are actually used for the manufacture of methamphetamine."  Agent Frazier explained:

> [T]he Crown Royal bottle is going to be your sulfuric acid.  The DampRid is used in the gas generator.  There's tubing in the gas generator.  And in the Coffeemate coffee can with the plastic bag over [it] was lithium strips that had been cut out of batteries.

The officers also discovered glass jars and coffee filters.

After examining the materials in the back of the pickup truck, Appellant showed the officers the two outbuildings behind the trailer.  He identified one of the outbuildings as "where he actually had manufactured meth at one time before."  Inside that outbuilding, the officers found "a big pile of rubber gloves, some coffee filters, another Mason jar, and a heat lamp . . . or a heat bulb s[i]tting inside the Mason jar."  Additionally, "[t]here was a wood stove, another sink where [Appellant] said he had burned some of his components before and got rid of evidence and stuff in the wood stove."  Agent Frazier explained:

> In the gassing-off process, when you got the tube over in there, the sulphuric gas is coming out and it's highly corrosive.  And you use the gloves to keep it from burning your hands.  And it will actually turn the gloves yellow and sometimes they have to keep them changed because the sulphuric acid will start . . . melting the glove.  And they'll have to change gloves.

Once the officers returned to the sheriff's department, Agent Frazier tested "the bottles and stuff, and it tested for corrosive acids and it tested high pH . . . on the gas generators." For safety reasons, Agent Frazier did not conduct any testing to determine the presence of methamphetamine.

Tina Wilkerson testified for Appellant. On February 22, 2012, she lived in a trailer on Cherry Chapel Loop. Her daughter, Brandy Wilkerson, and several young grandchildren lived with her. Although married, Mrs. Wilkerson did not live in the same residence as Appellant. She and her daughter each owned a trailer on the property, and Appellant "live[d] in a shed behind the house."

Mrs. Wilkerson was inside her trailer at the washer and dryer when the officers arrived. She had the front door open because she was watching her grandchildren. Appellant was not inside the trailer. While the officers talked with Appellant, Mrs. Wilkerson "went on about my business, watching the kids and washing clothes." She did not give the officers consent to search the property and denied hearing Appellant give consent. Mrs. Wilkerson stated that the gun discovered in the closet belonged to her. Mrs. Wilkerson said that the pickup truck had been driven onto the property by Appellant's nephew, Jimmy Wilkerson, but she did not know who owned the truck. Mrs. Wilkerson did not think that her daughter, Brandy Wilkerson, owned the truck and did not know whether Jimmy Wilkerson left anything in the truck.

Defendant did not testify.

The jury convicted Appellant of the charged offenses of (1) promotion of methamphetamine manufacture, a Class D felony, (2) initiation of methamphetamine manufacture, a Class B felony, and (3) unlawful possession of drug paraphernalia, a Class A misdemeanor. The jury found Appellant not guilty of unlawful possession of a weapon. A sentencing hearing was held on November 25, 2013, and the trial court sentenced Appellant, as a standard offender, to three years in the custody of the Tennessee Department of Correction for the promotion offense, to ten years in the custody of the Tennessee Department of Correction for the initiation offense, and to eleven months, twenty-nine days in the county jail with a fine of $2,500 for the drug paraphernalia offense.[4]

The trial court denied the Appellant's motion for new trial. This timely appeal followed.

---

[4] The judgments do not indicate whether Appellant's sentences are to be served concurrently or consecutively, and a transcript of the sentencing hearing was not included in the record. Pursuant to Tennessee Rule of Criminal Procedure 32(c)(1), the sentences are deemed to be concurrent.

*Analysis*

Defendant argues that the evidence is insufficient to support his convictions[5] and that the trial court abused its discretion by sentencing him to an effective ten-year sentence in the custody of the Tennessee Department of Correction. The State argues that evidence presented at trial is sufficient and that Appellant's sentences are proper and presumptively reasonable.

*A. Sufficiency of the Evidence*

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In relevant part, Tennessee Code Annotated section 39-17-433 provides:

---

[5] In his motion for new trial, Appellant only contested the sufficiency of the evidence as to the promotion and initiation convictions. He did not challenge the drug paraphernalia conviction. His appellate brief, however, specifically addresses this conviction. Although not argued by the State, we note that review of this issue is not waived under Tennessee Rule of Appellate Procedure 3(e) because a successful challenge to the sufficiency of the evidence would result in dismissal of the prosecution, rather than simply a new trial. *State v. Keel*, 882 S.W.2d 410, 416 n.5 (Tenn. Crim. App. 1994).

(a) It is an offense for a person to promote methamphetamine manufacture. A person promotes methamphetamine manufacture who:

(1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use.

Tennessee Code Annotated section 39-17-435(a) provides: "It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Tennessee Code Annotated section 39-17-425(a)(1) provides:

[I]t is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part.

Methamphetamine is a Schedule II controlled substance. T.C.A. § 39-17-408(d)(2).

Appellant contends that, because all of the alleged contraband was discovered in the bed of a pickup truck belonging to his daughter, "[t]he record is void of any proof that Appellant had any knowledge of what was discovered in the bed of the pickup truck or that the alleged contraband found therein would lead a trier [of] fact to find that Appellant promoted methamphetamine manufacture, initiated a process intended to result in the manufacture of any amount of methamphetamine or possessed drug paraphernalia." We disagree.

In the light most favorable to the State, the evidence presented at trial established that Investigator Amos and Agent Frazier visited 11125 Cherry Chapel Loop after Appellant purchased pseudoephedrine in Florence, Alabama. When the officers first observed Appellant, he was wearing a pair of latex gloves, and a coffee filter was eventually found on or in the presence of Appellant's person. Appellant consented to a search of the primary trailer on the property and led Investigator Amos to his bedroom, where Investigator Amos found a set of digital scales. Approximately ten feet behind the trailer, in the bed of a pickup truck registered to Brandy Wilkerson, Agent Frazier discovered a black garbage bag and a black and white plastic container, each containing various materials known to Investigator Amos and Agent Frazier to be used in the manufacture of methamphetamine. These materials included: ten "cooked-off" bottles, one bottle that was an "active meth lab," Mason jars, lithium battery strips, containers of

the chemical commercially known as DampRid, a Crown Royal bottle containing sulfuric acid, and tubing. During the search of the premises, Appellant escorted the officers into an outbuilding in which they found "a big pile of rubber gloves, some coffee filters, another Mason jar," and a heat bulb. Appellant admitted that he had previously manufactured methamphetamine in the outbuilding and that he had disposed of some manufacturing materials in a wood stove. The strongest evidence against the Appellant is the fact that after being arrested and questioned at the Hardin County Sheriff's Department, Appellant signed a written statement claiming responsibility for the contraband discovered on the premises and verbally did the same. At the sheriff's office, Agent Frazier was able to test some of the materials and identified high pH and corrosive acid.

The foregoing evidence is more than sufficient to sustain all of Appellant's convictions. Both officers testified that they had substantial qualifications and experience in investigating and identifying methamphetamine manufacture. Based on their experience and training, they knew that the various materials discovered in the bed of the pickup truck and in the outbuilding could be and clearly had been purchased or acquired and used to manufacture methamphetamine, a controlled substance under Tennessee law. Indeed, one of the bottles was being used as an "active meth lab," already engaged in the manufacturing process. There can be no denying that someone knew exactly what they were doing with all of these materials—manufacturing an illegal drug.

Appellant's argument on appeal is that the evidence is insufficient to establish beyond a reasonable doubt that *he* was the one using these materials to manufacture methamphetamine on the premises. Appellant was found to be wearing latex gloves and in possession of a coffee filter, both materials used in the manufacturing process, when the officers arrived. Most compelling, however, is the fact that Appellant admitted to having manufactured methamphetamine in the outbuilding on the premises and admitted in his written statement to owning or possessing all of the manufacturing materials discovered by the officers. This argument is without merit.

*B. Sentencing*

Appellant argues that the trial court erred in sentencing him to ten years for his conviction for initiation of methamphetamine manufacture. He asserts that the trial court ignored the principles of our sentencing statutes and should have only sentenced him to the minimum of eight years, just as it ordered minimum sentences for the other two convictions.

When a defendant challenges the length, range, or manner of service of a sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion

standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. Among the purposes and principles of sentencing is that the imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). The length of the resulting consecutive sentence must "be no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2).

The record on appeal contains the presentence report that was the only exhibit introduced at Appellant's sentencing hearing. As previously noted, there is no transcript of the sentencing hearing contained in the record. It is Appellant's burden to compile an appellate record that is "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Appellant acknowledges that his sentences are within the applicable ranges for his convictions but claims that the trial court failed "to follow the statutory sentencing requirements of the Tennessee Criminal Sentencing Reform Act of 1989." A trial court is subject to several mandatory requirements when imposing a sentence for a criminal defendant. *See* T.C.A. § 40-35-210. However, the merits of Appellant's argument cannot be evaluated without a transcript of the sentencing hearing because there is no evidence that the trial court failed to abide by any statutory requirements. Appellant's failure to provide the transcript constitutes a waiver of this issue, and the trial court is conclusively presumed to have ruled correctly. *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993); *State v. Matthews*, 805 S.W.2d 776, 784 (Tenn. Crim. App. 1990); *see also State v. Angela Ann Collins*, No. M2008-02766-CCA-R3-CD, 2010 WL 271267, at *3 (Tenn. Crim. App. Jan. 25, 2010); *State v. Frank Walker, Jr.*, No. 02C01-9401-CC-00009, 1994 WL 525566, at *1-2 (Tenn. Crim. App. Sept. 28, 1994); *cf. State v. Gregory Mathis*, No. M2011-01096-CCA-R3-CD, 2013 WL 4774130, at *12 (Tenn. Crim. App. Sept. 5, 2013) (declining to apply waiver where record contained "the trial court's detailed sentencing orders . . . and the evidence introduce[d] at the sentencing hearing"), *perm. app. denied* (Tenn. Dec. 12, 2013). Accordingly, Appellant has not shown that he is entitled to relief from his sentences.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE